```
              IN THE UNITED STATES DISTRICT COURT       O
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
                       EASTERN DIVISION

OPTIMAL PETS, INC.              *

        Plaintiff               *

    vs.                         *    EDCV-08-1795 MJG

NUTRI-VET, LLC, et al.          *

        Defendants              *

*       *       *       *       *       *       *       *       *
```

MEMORANDUM AND ORDER: RE SUMMARY JUDGMENT

The Court has before it Defendants' Motion for Summary Judgement (sic) [Document 36] and the materials submitted relating thereto. The Court has held a hearing and has had the benefit of the arguments of counsel.

I.  INTRODUCTION

The instant case involves a dispute over the use of the name "Optimal Pet(s)" in connection with the sale of pet vitamins.

As discussed herein, in or about January 2004, Plaintiff Optimal Pets, Inc. ("OPI"), a California corporation, began using the name "Optimal Pets" to identify pet products, including vitamins, that it was offering for sale on its Internet website and in other ways. OPI's sales of products using the name "Optimal Pets" were modest, with gross sales

totaling, for the four years 2004 to 2008, some $35,000 or less. OPI did not register OPTIMAL PETS as a trademark with the United States Patent and Trademark Office, but contends that it acquired common law trademark rights by virtue of its use of the name in commerce.

As discussed more fully herein, in 2008 Defendants Nutri-Vet LLC ("Nutri-Vet") and Vitamin Shoppe Industries, Inc, ("Vitamin Shoppe") began using the name "Optimal Pet" to identify pet vitamins they were offering for sale. On May 13, 2008, Nutri-Vet filed with the United States Patent and Trademark Office an application for federal registration of the OPTIMAL PET trademark.[1] (Cornwell Decl., Feb. 12, 2010, Ex. A.) In August 2008, Defendants began selling products labeled with the OPTIMAL PET trademark via the Internet and through Vitamin Shoppe's approximately 422 retail stores located in 37 states.[2] (Ex. D to Holley Decl., Jones Dep. 14:23-16:4, 37:6-38:16, Ex. 46.) Through September 2009, Vitamin Shoppe's total gross sales

---

[1] Nutri-Vet's federal trademark application was approved for publication on January 31, 2009. ((Cornwell Decl., Feb. 12, 2010, Ex. A.) OPI filed a petition to oppose on April 7, 2009. Proceedings before the Trademark Trial and Appeal Board have been suspended pending the result of the instant lawsuit. (Cornwell Decl., Feb. 12, 2010, Ex. B.)

[2] Thereafter, Defendants received cease and desist letters from OPI. (Defs.' Mot. for Summ. J. [Document 36] at 3.) On December 8, 2998, OPI sent a second set of demand letters seeking $75,000 in damages and simultaneously filed the instant lawsuit. (Id.)

of OPTIMAL PET products were over $260,000 and Nutri-Vet's were over $168,089.00.  (Ex. J to Holley Decl., Squar Dep. 13:16-20, 16:7-12, Ex. 84.)

In this case, OPI is suing Defendants for their allegedly improper use of the name "Optimal Pets" asserting claims for trademark infringement, false designation of origin under the Lanham Act and unfair competition under California law.

By the instant motion, Defendants seek summary judgment on the ground that OPI "cannot establish market recognition or market penetration sufficient to establish enforceable . . . trademark rights [in the name "Optimal Pets"] either nationally or in any specific geographical area."  (Defs.' Mot. for Summ. J. [Document 36] at 2.)

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

The well-established principles pertinent to such motions can be distilled to a simple statement. The Court may look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose-colored glasses, but must

view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant, or whether the movant would, at trial, be entitled to judgment as a matter of law. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).

III. DISCUSSION

    A. Trademark Rights

To prevail on its trademark infringement claim, OPI must prove that it "has a valid protectable trademark, and that Defendants' use of the same or similar mark causes a likelihood of confusion in the minds of the relevant consuming public." See Glow Industries, Inc. v. Lopez, 252 F. Supp. 2d. 962, 975 (C.D. Cal. 2002). Because OPI did not register "Optimal Pets" as a trademark with the United States Patent and Trademark Office,[3] it must prove that it acquired common law ownership rights in the trademark.

A plaintiff asserting common law ownership rights in a trademark, must establish (1) that it is the senior user of the mark and (2) legally sufficient market penetration in a certain

---

[3] Federal registration of a trademark provides a presumption of ownership. See Glow Industries, 252 F. Supp. 2d at 976.

geographic area[4] to establish ownership rights. Credit One Corp. v. Credit One Financial, Inc., 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009) (citing Glow Industries, 252 F. Supp. 2d at 983).

There is no doubt that the evidence is sufficient to enable a fact finder to find that OPI is the senior user of the trademark at issue by virtue of its first use of the mark in 2004 and continuous and uninterrupted use thereafter. See Pollution Denim & Co. v. Pollution Clothing Co., 547 F. Supp. 2d 1132, 1141 (C.D. Cal. 2007) (citing Dept. of Parks & Recreation v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1125-26 (9th Cir. 2006)). Defendants, however, contend that there is insufficient evidence to permit a reasonable fact finder to conclude that OPI has established sufficient market penetration in any geographical area.

The Ninth Circuit has identified the following factors to determine the extent of market penetration: (1) volume of sales; (2) growth trends; (3) the number of people who purchased the party's goods in relation to the number of potential customers; and (4) the amount of advertising. Adray v. Adry-Mart, Inc., 76

---

[4] The Court notes, but need not now address, that various issues may be presented in the instant case by virtue of the significance of marketing through the Internet. For example, how is a sale through an Internet website considered in the context of establishing market penetration in a geographical area?

F.3d 984, 989 (9th Cir. 1995) (citing <u>Natural Footwear Ltd. v. Hart, Schaffner & Marx</u>, 760 F.2d 1383, 1398-99 (3rd Cir. 1985)).

At the motion hearing, counsel agreed that a proper articulation of the test to be applied to determine establishment of a common law trademark right would be whether, following OPI's first use of the trademark in commerce, there is:

> a follow up of activities that, in the context of the particular industry [or] trade, is sufficient to show a genuine intent to put the product on the market under that name on a commercial scale in the context of the market within a reasonable time.

(Summ. J. Hr'g Tr. 26:13-18, Apr. 28, 2010.)

Assuming, as it must in the summary judgment context, that the fact finder will accept Plaintiff's evidence, the Court cannot conclude that OPI will be unable to establish sufficient market penetration in <u>any</u> geographical area. Certainly, it appears unlikely that OPI will be able to establish its claim to a common law trademark with nationwide scope. However, it is possible for a reasonable fact finder to conclude that OPI's evidence is sufficient to establish some trademark rights with respect to some market. The resolution of the scope of such rights, if any, will require the determination of a multitude of factual issues.

OPI has presented evidence to establish that initially it focused its marketing and sales efforts on a niche market of pet professionals such as breeders, trainers, kennels, veterinary clinics, pet rescue groups and the like. (Garmon Decl. ¶¶ 11-12; Garmon Dep. 31:13-23; Ex. A to Holley Decl., Bookout Dep. 55:18-24. 59:2-5, 86:3-87:16, Oct. 21, 2009.)

OPI offered its Optimal Pets products for sale through its website, www.optimalpets.com. (Garmon Decl. ¶ 18, Ex. I.) OPI also set up promotional booths at, or provided other advertising for, pet industry trade shows and dog shows throughout the United States. (Garmon Decl. ¶ 19, Ex. J; Garmon Dep. 66:7-9, 79:23-80:18, 83:3-84:4, 95:8-96:20; Bookout Dep. 59:6-64:12, Ex. 4.) OPI implemented an independent distributor and royalty program, marketed at pet professionals through direct mailers and direct meetings at the industry trade shows and dog shows. (Garmon Decl. ¶ 23, Ex. K.) Additionally, OPI sent out catalogs, flyers and "puppy packs" of free sample products to pet professionals. (Garmon Decl. ¶ 25.)

Beginning in or about January 2007, OPI began to expand its marketing and sales to include small, specialty pet product and health food stores. (Garmon Decl. ¶ 13.) OPI's marketing efforts in this regard included contacting hundreds of such retail stores through direct visits by sales representatives, direct mailers, and direct meetings at pet industry trade shows

7

and dog shows. (Garmon Decl. ¶ 26.) OPI has made sales of its products to at least fourteen such retail stores located in Arizona and Colorado. (Garmon Decl. ¶ 26, Garmon Dep. 66:14-67:13, 78:16-80:18, 102:12-18.) (Garmon Decl. ¶¶ 28, 33 Ex. M-N, Q.) OPI was featured in the May 2004 issue of Animal Wellness in its "Product Picks" section. (Garmon Decl. ¶ 30, Ex. O.) Animal Wellness has a readership of approximately 75,000 in the United States and Canada. (Garmon Decl. ¶ 28, Ex. M-N.) OPI also purchased advertising space in magazines such as Animal Wellness and the AKC Gazette & Event Calendar.

It is true that from January 2004 through December 2008, OPI's total gross sales of Optimal Pets products resulting from these marketing efforts was only some $35,000[5] to customers in thirty-four states. (Garmon Decl. ¶¶ 5-9, Ex. B-F.) Thus, there were no sales to any customers at all in sixteen states and rather low sales figures to customers in several other states. However, the fact remains that there were at least some sales to customers in thirty-four states. Moreover, there is evidence that OPI's Optimal Pets products were regularly sold in some fourteen stores, all or most of which are in Arizona or Colorado.

---

5   Defendants contend that the appropriate total is only some $26,000.

In sum, the Court cannot conclude now that no reasonable jury could find sufficient market penetration and/or recognition in any geographical area (or otherwise defined market) whatsoever.

B.  Defendants' Good Faith

OPI contends that Defendants cannot utilize the market penetration defense in this case because they did not adopt the trademark at issue in good faith.  As another district court has noted:

> In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like.

Honor Plastic Industrial v. Lollicup USA, 462 F. Supp 2d 1122, 1130 (E.D. Cal. 2006) (quoting Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415, 36 S.Ct. 357 (1916)).

There is evidence that could establish that in late 2007, Scott J. Garmon, the President, co-owner and founder of OPI, entered into negotiations with Defendant Vitamin Shoppe Industries, Inc, ("Vitamin Shoppe") on behalf of Garmon Corporation.  Garmon Corporation was the potential manufacturer

9

of a new line of pet vitamins to be sold by Vitamin Shoppe. (Pl.'s Opp'n to S.J. [Document 53] at 7.) Mr. Garmon never offered the OPTIMAL PETS mark to Vitamin Shoppe to use. (Stmt. of Undisputed Material Facts ¶ 21.) The negotiations were not successful. Vitamin Shoppe, instead of working with Garmon Corporation, agreed to have Defendant Nutri-Vet LLC ("Nutri-Vet") manufacture the new product line. (Ex. B to Decl. of Colin C. Holley [Document 56], Garmon Dep. 78:1-6, Oct. 22, 2009; Ex. F to Decl. of Frank J. Dykas [Document 41], Mullery Dep. 35:24-36:21 61:13-62:16, Nov. 6, 2009.)

Vitamin Shoppe and Nutri-Vet began looking for a suitable name for the new pet supplements. (Mullery Dep. 35:6-36:21.) Defendants deny any knowledge of OPI or its use of the Optimal Pets trademark at the time they adopted the OPTIMAL PET trademark. (Mullery Dep. 72:16-74:4, Ex. 52; Nipper Dep., Ex. 58.)

On April 1, 2008, Nutri-Vet provided Vitamin Shoppe with a list of 22 potential trademarks for consideration. The OPTIMAL PET mark was not on the list. (Mullery Dep. 59:8-61:8, Ex. 45.) The selection committee at Vitamin Shoppe selected two potential trademarks, Wellpet and Pet Solutions. (Mullery Dep. 62:21-24, Ex. 45.) Those marks were researched by Nutri-Vet's trademark attorney, who ruled them out on April 14, 2008. (Mullery Dep. 63:13-71:14, Ex. 47-49.)

10

At some point during the selection process, Nutri-Vet sent an e-mail to its trademark attorney that stated "The customer [Vitamin Shoppe] just called, change the search to 'Optimal Pet' . . . don't ask why?" (Ex. G to Holley Decl., Brown Dep. 37:21-38:25, Nov. 17, 2009.) Vitamin Shoppe denies telling Nutri-Vet to change the search to Optimal Pet. (Mullery Dep. 80:8-81:18, Ex. 56.) In any event, this e-mail, while probably susceptible of a perfectly benign explanation, could reasonably be viewed, in context, to support OPI's position.

Nutri-Vet's trademark attorney performed a search for the OPTIMAL PET mark, and reported favorable results to Vitamin Shoppe. (Mullery Dep. 72:16-74:4, Ex. 52; Ex. I to Holley Decl., Nipper Dep. Ex. 58, Nov. 18, 2009.) Ultimately, the Defendants decided to utilize OPTIMAL PET as the trademark for its line of pet vitamins.

Nutri-Vet avers that an employee and outside trademark attorney searched the Internet prior to adopting the mark, but did not find OPI's website. (Brown Dep. 14:17-15:8, 33:4-11, 39:11-40:23, 47:21-49:7.) OPI asserts that a proper search would have found its website and its use of the "Optimal Pets" name.

OPI further contends that the long-term relationship of Mr. Garmon and Nutri-Vet's president[6] and the fact that Defendants had employees who tracked the activities of competitors rendered it likely that Defendants were aware of OPI and its use of the trademark at issue. These assertions, hardly outcome determinative, nevertheless would be part of the background context in which the trier of fact would determine Defendants' good faith.

The Court concludes that there are genuine issues of material fact that prevent a grant of summary judgment with regard Defendants' good faith in adopting "Optimal Pet" as a trademark.

### C. Likelihood of Confusion

To establish its trademark infringement, Lanham Act[7] and state law unfair competition claims,[8] OPI must prove that there is a likelihood of confusion between Defendants' products

---

[6] They were founders and board members of a trade association.

[7] Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that "[a] Any person who . . . in connection with any goods . . . uses in commerce any . . . name . . . , symbol, or device, or any combination thereof, or any false designation of which . . . is likely to cause confusion . . . shall be liable . . ."

[8] See Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1994).

labeled under the name "Optimal Pet" and its alleged "Optimal Pets" trademark.

The Ninth Circuit considers at least eight factors to analyze the likelihood of confusion in trademark infringement cases: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of the defendant's intent in selecting and using the allegedly infringing name; and (8) the likelihood that the parties will expand their product lines. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir.1979) (abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792 (2003)).

A plaintiff is not required to establish that each of the eight Sleekcraft factors favors a finding of likelihood of confusion, and courts need not address every factor. Glow Industries, 252 F. Supp. at 986. The comparative importance of each factor will vary from case to case. See eAcceleration Corp. v. Trend Micro, Inc., 408 F.Supp.2d 1110, 1116 (W.D. Wash. 2006). In cases involving competing websites, for example, the similarity of the marks, the relatedness of the goods, and the

13

use of common marketing channels are more important factors. See id. (citing GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000)).

In the instant case there is no doubt that a reasonable jury could find a likelihood of confusion between OPI's OPTIMAL PETS and Defendants' OPTIMAL PET marks. The marks appear and sound identical, are used to sell virtually identical products, and there is evidence from which a jury could find that the parties' marketing channels overlap to some extent.

Summary judgment on the issue of likelihood of confusion is warranted only in rare instances and "only if 'no genuine issue' exists regarding likelihood of confusion." Thane Intern., Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901-02 (9th Cir. 2002). In the instant case, the Court concludes that there are genuine issues of material fact that prevent a grant of summary judgment to Defendants with regard to the likelihood of confusion.

IV.  CONCLUSION

For the foregoing reasons:

1. Defendants' Motion for Summary Judgment [Document 36] is DENIED.

2. The case is scheduled for trial, if a trial is necessary, to be held commencing November 1, 2010 in the Riverside Courthouse.

3. The parties shall proceed expeditiously with mediation and settlement efforts.

    4. If no settlement has been reached by July 15, 2010, Plaintiff shall arrange a telephone conference to be held by July 31, 2010 to address pretrial and trial matters.

SO ORDERED on <u>Monday, June 07, 2010</u>.

                                                 /s/
                                    Marvin J. Garbis
                        United States District Judge