IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

OPTIMAL PETS, INC.                    *

        Plaintiff              *

        vs.                    *    EDCV-08-1795 MJG

NUTRI-VET, LLC, et al.               *

        Defendants             *

\*      \*      \*      \*      \*      \*      \*      \*      \*

<u>MEMORANDUM AND ORDER RE: JUDGMENT AS A MATTER OF LAW</u>

The Court has before it Defendants' Renewed Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50 and the materials submitted related thereto.  The Court has held a hearing and had the benefit of the arguments of counsel.


I.    <u>BACKGROUND</u>

The instant case grew out of the competition between two producers of pet vitamins and dietary supplements to obtain a contract with a national chain of vitamin distributors.

In 2004, the Garmon Corporation, led by Scott Garmon ("Garmon") was a well-established producer of pet products, primarily selling to large retailers such as Petco, PetSmart, and Pet Supermarket, under various trademarked brand names,

e.g., Green Tree, Pet Organics, and NaturVet.  At this time,
Bill Bookout ("Bookout") was the President of the National
Animal Supplement Council ("NASC"), an industry trade
association.  Bookout was also operating a "side" business —
Genesis, Limited — that sold pet products primarily to
veterinarians who resold the products to their patient's owners.

        Garmon and Bookout decided to form a jointly-owned business
that would sell primarily to pet professionals, i.e., breeders,
trainers, rescue groups, kennels, etc.  They chose a name for
the new business that was unassociated with either Garmon or
Bookout, since (1) the joint venture would be somewhat in
competition with customers of both the Garmon Corporation and
Genesis Limited, and (2) Bookout would be engaged in business
with one of the members of the board of NASC, a board that
included competitors of the Garmon Corporation.

        They formed Plaintiff, Optimal Pets, Inc. ("OPI").  OPI
purchased products from Garmon Corporation and Genesis Limited.
OPI's shares were owned 50% by Garmon, and 50% were in the name
of Bookout's cousin.[1]  OPI set up a website and commenced efforts
to sell pet products under the name "Optimal Pets" in January
2004, aiming to develop a national niche market presence.

_____

[1] There may be a question whether the shares in the name of
Bookout's cousin were effectively owned and/or controlled by
Bookout.

As discussed in more detail herein, OPI started in early 2004 with a sales effort that, by 2008, had dwindled down to primarily accepting orders trickling in from the continuing offer of products on the internet website.  By 2008, the sales "success" of "Optimal Pets" products was de minimis.  Indeed, OPI's total gross sales for the entire period for which there is evidence of sales volume, January 2004 through to March 2009, (five years and three months) was less than $35,000.00,[2] which averages less than $6,700.00 per year.  In terms of an alleged nationwide market presence, there was not a single sale in the entire five-year period in 16 states.  In 28 states, the total gross sales for the entire five-year period - not sales per year - was less than $5,400.00.  This is an average of less than $200.00 in total sales per state during the entire five-year period.  Accordingly, by the time of the events pertinent to the instant lawsuit, OPI was a minimally functioning business, essentially filling orders through its website.

In late 2007, Defendant Vitamin Shoppe Industries, Inc. ("Vitamin Shoppe") decided to add a product line of pet vitamins and supplements to sell in its chain of some 422 retail stores in 37 states and on the internet.  Vitamin Shoppe was interested

_____

[2] Including within this total about $8,500.00 of sales that were sold to a reseller that sold the products under a different brand name.

3

in having Garmon Corporation provide the products and commenced discussions with Garmon.  There was no problem with the production side of the arrangement, but there was a problem with the brand name for the products.

Vitamin Shoppe did not like any of the brand names that Garmon Corporation proposed for the private label.  Garmon did not propose the name "Optimal Pets," presumably because using that name would have raised the possibility that the Bookout side of OPI would be entitled to some share of the Vitamin Shoppe business.  Eventually, Vitamin Shoppe decided to find a different source of product and commenced discussions with Defendant Nutri-Vet, LLC ("Nutri-Vet").

Initially, Nutri-Vet was no more able than Garmon to find a name that Vitamin Shoppe would accept.  Ultimately, however, the name "Optimal Pet" was proposed, liked by Vitamin Shoppe, and cleared by Nutri-Vet's trademark attorney as available for use and trademark registration.  Thus, the name "Optimal Pet" was adopted as the brand name for the new line of products. Nutri-Vet applied for federal trademark registration of the "Optimal Pet" name in May 2008.[3]

---

[3] Nutri-Vet's registration was approved for publication on January 31, 2009, after the filing of the instant lawsuit. Thereafter, OPI filed a petition to oppose.  Proceedings before the Trademark Trial and Appeal Board are suspended pending the result of the instant lawsuit.

Nutri-Vet thereafter began production of products under the name "Optimal Pet" for Vitamin Shoppe.  The Vitamin Shoppe product launch of the "Optimal Pet" line of pet vitamins and supplements began on August 1, 2008.  Within a few days, Garmon learned of the use of the name "Optimal Pet."  In September 2008, OPI had an attorney send a "cease and desist" letter to Defendants Vitamin Shoppe and Nutri-Vet.  The letter stated that OPI had nationwide common law rights to the trademark "Optimal Pets" for pet products and demanded that the Defendants cease and desist infringing by use of the name "Optimal Pet."

Defendants, deciding that OPI did not have common law trademark rights nationwide, or anywhere for that matter, refused to cease and desist.  Garmon then decided to institute the instant lawsuit but found that Bookout did not wish to be associated — even through a cousin — with litigation against a member of the NASC board.  Thereupon, Garmon acquired Bookout's cousin's ownership interest, and OPI filed the instant lawsuit.

II.  <u>PROCEDURAL SETTING</u>

The Court, having denied Defendants' motion for summary judgment,[4] proceeded to trial by jury.  Prior to submission of the case to the jury, both sides moved for Judgment as a Matter

---

[4] <u>See</u> Memorandum and Order: Re Summary Judgment [Document 70].

of Law under Fed. R. Civ. P. 50.  Defendants sought judgment on all claims on the ground that OPI failed to introduce evidence sufficient to prove market penetration, resulting in the inability to establish that it had a valid and legally enforceable common law trademark.[5]  The Court denied the motion without prejudice to its renewal after verdict.  OPI sought Judgment as a Matter of Law on Defendants' lack of likelihood of confusion defense.[6]  The Court granted this motion.

Thus, the case was submitted to the jury for determination of whether, and to what extent, OPI had established enforceable common law trademark rights, and whether Defendants had adopted the name "Optimal Pet" in bad faith.

As detailed in the Appendix hereto, the jury ultimately returned a partial verdict on a Second Revised Verdict Form, providing unanimous answers to the questions relating to trademark rights as follows:

---

[5] See Defendants' Memorandum of Points and Authorities in Support of their Motion for Judgment as a Matter of Law Pursuant to Rule 50 of the F.R.C.P. [Document 159].

[6] See Plaintiff Optimal Pets, Inc.'s Motion for Judgment as a Matter of Law on Defendants' Defense of a Lack of Likelihood of Confusion; Memorandum of Points and Authorities [Document 160].

Question 1.    In which geographical areas, if any, has Plaintiff Optimal Pets, Inc. proven by a preponderance of the evidence that, by August 2008, it had used in commerce the name "Optimal Pets" as a trademark for the products at issue?

Answer: The entire United States


Question 2 A.  In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"

Answer: Zip codes 86305[7] and 64113.[8]

Question 2B.   In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has not proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"

Answer: [Sixteen named states].[9]

The jury did not reach a unanimous verdict as to the following questions related to Defendants' intent:

---

[7] In Prescott, Arizona.
[8] In Kansas City, Missouri.
[9] Alabama, Delaware, Hawaii, Iowa, Maine, Mississippi, North Dakota, Nebraska, New Hampshire, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Utah, West Virginia, and Wyoming.  These were the 16 states where there were never any "Optimal Pets" sales.

> Question 3.  Has Plaintiff Optimal Pets,
> Inc. proven by a preponderance of the
> evidence that Defendant Nutri-Vet, LLC
> adopted the name "Optimal Pet" for the
> products at issue in bad faith?
>
> Answer:  No unanimity
>
> Question 4.  Has Plaintiff Optimal Pets,
> Inc. proven by a preponderance of the
> evidence that Defendant Vitamin Shoppe
> Industries, Inc. adopted the name "Optimal
> Pet" for the products at issue in bad faith?
>
> Answer:  No unanimity

By the instant motion, Defendants seek judgment as a matter of law establishing that OPI has failed to present evidence adequate to prove (1) that it had sufficient market penetration to establish common law ownership rights in "Optimal Pets" in any geographical area, (2) that neither Defendant adopted the name "Optimal Pet" for the products at issue in bad faith, and (3) that OPI cannot establish that any infringement would have been willful.

## III. DISCUSSION

### A.   COMMON LAW TRADEMARK RIGHTS

#### 1.   Legal Framework

One can establish enforceable trademark rights through the use of a trademark in commerce and federal registration under

the Lanham Act[10] (nationwide rights), some analogous state

registration systems (statewide rights), or by virtue of a

common law trademark in a particular area.  OPI did not register

the trademark at issue with the United States Patent and

Trademark Office or with any state.  Accordingly, the issue

presented is whether, as of the date that Defendants used the

name "Optimal Pet" in commerce (August 2008), OPI had acquired

common law trademark rights with regard to a geographical area

in which Defendants used the name.

To establish common law trademark rights in a geographical

area, OPI had to be the first to use the name "Optimal Pets" in

commerce to designate the pertinent products in the area and had

---

[10] The Lanham Act provides:

> The term "use in commerce" means the bona fide
> use of a mark in the ordinary course of trade, and
> not made merely to reserve a right in a mark.  For
> purposes of this chapter, a mark shall be deemed to
> be in use in commerce--
>
> (1) on goods when--
>
> (A) it is placed in any manner on the goods or
> their containers or the displays associated
> therewith or on the tags or labels affixed thereto,
> or if the nature of the goods makes such placement
> impracticable, then on documents associated with
> the goods or their sale, and
>
> (B) the goods are sold or transported in
> commerce,

15 U.S.C. § 1127.

to continue to so use the name in that area.  See Halicki Films, LLC v. Sanderson Sales & Marketing, 547 F.3d 1213, 1226 (9th Cir. 2008)(citing Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996)); Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 761-62 (9th Cir. 2006)(describing the common law innocent-use defense).

The first to use a mark in an area is deemed the "senior" user and has the right to enjoin "junior" users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion.  Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999).  Thus, in the absence of federal registration, both a senior and junior user would have the right to expand into unoccupied territory and establish customer recognition in that territory.  See id. at 1054 ("Even where there is precise identity of a complainant's and an alleged infringer's mark, there may be no consumer confusion — and thus no trademark infringement — if the alleged infringer is in a different geographic area . . . .").

To maintain a  common law trademark right there must be a continuing use.  Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 762 (9th Cir. 2006). "To be a continuing use, the use must be maintained without interruption." Casual Corner Assocs., Inc. v.

Casual Stores of Nevada, Inc., 493 F.2d 709, 712 (9th Cir.
1974); see also Dep't of Parks & Recreation v. Bazaar Del Mundo
Inc., 448 F.3d 1118, 1126 (9th Cir. 2006)(requiring proof that
the mark's actual use in commerce was continuous and not
interrupted).  Trademark rights are not created by a sporadic or
casual use; there must be an active and public attempt to
establish trade.  See id.

To establish enforceable common law trademark rights in a
geographical area, a plaintiff must prove that, in that area,
(1) it is the senior user of the mark, and (2) it has
established legally sufficient market penetration. See, e.g.,
Credit One Corp. v. Credit One Financial, Inc., 661 F. Supp. 2d
1134, 1138 (C.D. Cal. 2009)("A party asserting common law rights
must not only establish that it is the senior user, it must also
show that it has 'legally sufficient market penetration' in a
certain geographic market to establish those trademark rights."
(quoting Glow Indus. Inc. v. Lopez, 252 F. Supp. 2d 962, 983
(C.D. Cal. 2002)).[11]

---

[11] OPI suggests that requiring a senior user of a distinctive
mark to further pass a market penetration test is the equivalent
of requiring all senior users to pass a secondary meaning test
irrespective of whether the mark is distinctive, and that is
contrary to trademark law.  OPI contends that the proper test
for establishing the right to assert a distinctive trademark is
found in Pollution Denim & Co. v. Pollution Clothing Co., 547 F.
Supp. 2d 1132, 1141 (C.D. Cal. 2007), which closely tracks the
wording in the Jury Instruction for Question 1.  The Court

In the Glow decision, the court stated that a senior user of a distinctive unregistered mark must demonstrate the territorial scope of its trademark use.  See 252 F. Supp. 2d at 983 ("Generally, in the absence of federal registration, both parties have the right to expand their use of an unregistered mark into unoccupied territory and establish exclusive rights by being first in that territory. In effect, it is a race between the parties to establish customer recognition in unoccupied territory." (citations omitted)).

The Glow court recognized that a senior trademark user is entitled to assert its rights only in areas in which it has legally sufficient market penetration. Id.  The court stated that legally sufficient market penetration "is determined by examining the trademark user's volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising." Id. (adopting the test for legally sufficient

---

notes, however, that the Pollution Denim case relied on by OPI clearly indicates that a "senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and goodwill," and even an owner of a federally registered mark "is not entitled to injunctive relief except in the area actually penetrated through use of the mark." Pollution Denim, 547 F. Supp. 2d at 1141 n.34 (citations omitted). "[P]rotection is only potential in areas where the registrant in fact does not do business and a competing user could use the mark there until the registrant extended its business to the area." Id.

market penetration from <u>Natural Footwear, Ltd. v. Hart,</u>

<u>Schaffner & Marx</u>, 760 F.2d 1383, 1398-99 (3d Cir. 1985)).


      2.   <u>Jury Verdict</u>

        a.   <u>Senior User</u>

With regard to the senior use issue, the Court instructed

the jury, without objection:

> Optimal Pets, Inc. would have used the name "Optimal Pets" in commerce as a trademark for the products at issue in an area if, following its first use of the name "Optimal Pets" in commerce in that area, there was a follow up of activities that, in the context of the particular industry or trade, was sufficient to show a genuine intent to put the product on the market under that name on a commercial scale in the context of the market within a reasonable time.


The jury returned the following verdict:

> Question 1.   In which geographical areas, if any, has Plaintiff Optimal Pets, Inc. proven by a preponderance of the evidence that, by August 2008, it had used in commerce the name "Optimal Pets" as a trademark for the products at issue?
>
> Answer: The entire United States

Defendants do not contend that OPI failed to present

evidence sufficient to permit the jury to make this finding.

The Court agrees.

The evidence established that in the first year or so of operations, OPI placed at least one substantial advertisement in a trade magazine with substantial circulation in the United States (and Canada), engaged in some sales-promoting activities in several states, and utilized an internet website to offer products for sale everywhere.

However, OPI's establishment of nationwide first-user status in 2004, does not establish enforceable common law trademark rights in all, or any part of, the nation in 2008. Rather, OPI must establish legally sufficient market penetration in a geographical area to have such rights in that area.

> b.   Sufficient Market Penetration

In regard to the sufficient market penetration questions, the jury was instructed, without objection:

> You shall determine the geographical area, if any, in which Optimal Pets, Inc. had legally sufficient market penetration by considering each of the following four factors, giving each factor the weight that you determine to be appropriate under the circumstances of this case.   The factors are: (1) the volume of sales of OPI's Optimal Pets products, (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the Optimal Pets products in relation to the potential number of customers; and (4) the amount of Optimal Pets product advertising in the area.

The jury returned the following verdict:

> Question 2 A.  In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"
>
> Answer: Zip codes 86305[12] and 64113.[13] [Note that Defendants had no sales at all in either of these zip codes].
>
> Question 2B.   In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has not proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"
>
> Answer: Alabama, Delaware, Hawaii, Iowa, Maine, Mississippi, North Dakota, Nebraska, New Hampshire, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Utah, West Virginia, and Wyoming.

The Jury, therefore, found the absence of sufficient market penetration in 16 states, sufficient market penetration in 2 zip codes in which Defendants made no sales at any time, and it was unable to reach a unanimous verdict as to the rest of the country.

---

[12] In Prescott, Arizona.
[13] In Kansas City, Missouri.

15

3.   <u>Judgment as a Matter of Law</u>

a.   <u>Legal Standard</u>

Rule 50 of the Federal Rules of Civil Procedure provides in pertinent part:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.
>
> Fed. R. Civ. P. 50(b).

Rule 50 thus "allows a trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." <u>Weisgram v. Marley Co.</u>, 528 U.S. 440, 448 (2000).  A court should only render judgment as a matter of law "when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149 (2000)(quoting Fed. R. Civ. P. 50(a)).

"The standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry

under each is the same.'" Id. at 150 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)). The court should review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, but not weigh the evidence or make credibility determinations.  Id.  In other words, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (citations omitted).

For a party to prevail on its renewed motion for judgment as a matter of law following a jury trial, the party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998).  "Judgment as a matter of law is proper only if there can be but one reasonable conclusion as to the verdict."  Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1372 (Fed. Cir. 2011)(citations omitted).

b.    <u>Adequacy of Proof</u>

As discussed herein, the Court concludes that no reasonable jury could properly find that OPI had legally sufficient market penetration to establish, as of August 2008, enforceable common law trademark rights in any geographical area.

The factors to be considered in determining whether OPI has established legally sufficient market penetration in a geographical area are, in regard to that area:

1.    The volume of sales of OPI's "Optimal Pets" products;

2.    The growth trends (both positive and negative);

3.    The number of persons actually purchasing the "Optimal Pets" products in relation to the potential number of customers; and

4.    The amount of "Optimal Pets" product advertising in the area.

i. <u>The Internet</u>

From the beginning of its use of the name "Optimal Pets," OPI maintained a website and made sales through the internet. Indeed, by 2008, OPI did little, if anything, else to promote sales other than maintain the website.

"[T]he limits of territorial protection for a common law mark become much more difficult to define once that mark is placed on the Internet. . . . mostly due to the apparent lack of 'boundaries' on the Internet."  Brian L. Berlandi, <u>What State Am</u>

18

I In?: Common Law Trademarks on the Internet, 4 Mich. Telecomm.
& Tech. L. Rev. 105, 123-24 (1998); see also David S. Barrett,
The Future of the Concurrent Use of Trademarks Doctrine in the
Information Age, 23 Hastings Comm. & Ent. L.J. 687, 696-97
(2001).

It may be possible to view cyberspace as its own distinct
market.  See Barrett, supra, 700.  As such, it could be
evaluated separately from any geographic territory to determine
the level of "cyber-market" penetration and, possibly, establish
common law rights for internet sales using a mark even though
such rights could not be established as to any physical
geographical area.

While OPI has not sought recognition of a common law right
in cyberspace, the evidence established that, as of 2008, it was
doing little, if anything, to promote a market presence other
than through its website.  Indeed, except for some very minimal
sales, it appears that virtually every OPI sale was through a
mail or internet order.

In considering the adequacy of OPI's proof of sufficient
market penetration, evidence regarding internet sales and
internet advertising will be considered together with the
evidence of sales and advertising in geographic areas.  Thus, a

sale to a customer through the internet will be considered a sale in the geographical area in which the customer is located.

### ii.   Volume Of Sales[14]

OPI's volume of sales was beneath any reasonable threshold for a finding of legally sufficient market penetration in any state as of August 2008.  Indeed, for the entire year of 2008, OPI had no sales at all in 34 states.  In 8 of the 16 states in which there were any sales in 2008, total sales for the year were under $80.00 (ranging from $12.00 to $78.60 per state).  In four of the remaining six states, total sales for the year ranged from $117.50 to $569.48.  The two "big ticket" states were Arizona at $1,099.29 and Missouri at $1,888.69 with essentially all sales in each state in a single zip code.  None of these sales results were supportive of a position that OPI had sufficient market penetration anywhere.

### iii. Growth Trends

The evidence of growth trends through 2008 does not, by any means, support a finding of sufficient market penetration in any state.  In 34 states, OPI had no sales at all in 2008, and in 14 other states, total sales of less than $570.00.  In California,

---

[14] Sales numbers are based on Defs.' Trial Ex. 565-5, 566-5 and 575-1.

there was a downward trend with sales of $10,284.14[15] in 2005, $939.11 in 2006, $804.58 in 2007, and $222.00 in 2008.  In Arizona, the trend was virtually flat, with sales of $337.02 in 2005, $960.42 in 2006, $958.06 in 2007, and $1,099.29 in 2008. Only in Missouri was there an upward trend.  The Missouri sales total rose from $662.28 in 2006, to $1,084.20 in 2007, and $1,888.69 in 2008.  As noted above, however, virtually all Missouri sales were made in a single zip code.

Overall, after 2005, OPI had no sales growth, with total sales for the entire country of $5,288.56 in 2006, $5,428.02 in 2007, and $5,355.53 in 2008.

There was no evidence that would even arguably support a meaningful positive growth trend except with regard to a single zip code in Missouri.


iv.  Actual vis-à-vis Potential Purchasers

OPI has not presented evidence of actual vis-à-vis potential purchasers that would support its position.  Indeed, in regard to nationwide market penetration, even using OPI's contention that the size of the pertinent market was $5-10

---

[15] This includes a substantial sale of $8,473.46 to a California reseller who did not sell the products under the "Optimal Pets" name.  Without it, California sales in 2005 totaled $1,810.68.

million of retail sales per year,[16] its share of the market is de minimus.  Moreover, OPI did not present evidence that would support a finding that it had any more than a de minimus share of any pertinent market in any state or part thereof.  OPI did not even present evidence that would establish a meaningful market share in the two zip codes in which it had its best sales results.

Accordingly, OPI presented no evidence on which a jury could find that an actual vis-à-vis potential purchaser comparison would support its position.

v.    Advertising

OPI provided evidence of its marketing, advertising, and promotional sales activity.  In January 2004, OPI advertised "Optimal Pets"[17] products in Animal Wellness magazine.  The magazine has a distribution of about 75,000 in the United States and Canada.  Also, OPI's products were selected for the product-pick page of the magazine in May 2004.  However, there was no evidence of any further national magazine advertising after 2004.

---

[16] Trial Tr. 63:1-12, July 6, 2011.
[17] The corporate name provided in the advertisement was Optimal Health, Inc., but the products advertised bore the "Optimal Pets" label, and the website for ordering was www.optimalpets.com.

Garmon testified that OPI advertised in the American Kennel Club Gazette, which has a national readership, and mailed promotional material to American Kennel Club breeders. Trial Tr. 70:1-3, 78:6-8, July 6, 2011.  Garmon stated that OPI mailed promotional material to American Pet Dog Trainers Association, a national organization of about 3,000 dog trainers, and to regional rescue organizations, and attended tradeshows such as America's Family Pet Expo and regional dog shows in Arizona and California.  Some advertisements were placed in the dog show catalogs.  However, there is no evidence that OPI placed such advertisements after 2005, or that OPI attended trade shows after 2006.  Trial Tr. 50:15-51:7, 51:24-52:7, July 7, 2011.  While OPI presented some general allusions to advertisements, specifics were lacking.

OPI introduced evidence that there were some ongoing marketing activities, such as a royalty program, an independent distributor program, personal sales calls to health food stores, a website referral link from www.drbasco.com, and promotional packages called "puppy packs."  Puppy packs included a product brochure, product samples, the Product Pick certificate from Animal Wellness magazine, and other materials as appropriate to the event or distribution.  Although no records were kept, Garmon estimated that 6-10,000 puppy packs were given out from

2004 to 2008. Trial Tr. 84:18-24, July 6, 2011.  However, there
was no realistic evidence to support a finding that there were
more than de minimus marketing activities, if any at all, in
2008.

The only evidence of continuous marketing activity by OPI
from 2004 through 2008 is evidence of its maintenance of the
"Optimal Pets" website, www.optimalpets.com.  Sample pages from
the website were introduced, which showed the "Optimal Pets"
branded products and ability to order them online or request
further information.[18] Pl.'s Ex. 147.  Evidence was also provided
of some effort to optimize the website in an effort to make it
appear at the top of internet search lists.  The website was
used daily to check orders and ensure it was operating properly.
Trial Tr. 72:3-11, July 6, 2011.

OPI could not document its marketing and advertising costs.
Garmon estimated that over $100,000.00 was spent on marketing
and advertising efforts from 2004 through August of 2008, which
he said he thought reached about 100,000 pet professionals.
Trial Tr. 72:12-21, 73:24-25, 77:22-24, 86:25-87:5, 89:3-4,
89:12-15, 92:12-23, July 6, 2011.

---

[18] The pages were dated April 1, 2009, and the company name is
Optimal Pet Products, Inc., so they are not actually
representative of the website during the period in question.

As stated herein, OPI has produced evidence of some marketing activities, primarily in 2004 and 2005.  However, the "proof of the pudding" is that the totality of all that OPI claims to have done, including the alleged expenditure of over $100,000.00, produced a total of less than $35,000.00 in sales from 2004 through 2008, including a "one off" $8,500.00 transaction with a reseller who put the product on the retail market under a name different from "Optimal Pets."  And, there is no evidence that could support a finding that, by 2008, OPI was doing any more than passively maintaining a website and responding to a residual trickle of sales.

### vi.   Totality of Evidence

The Court, considering the pertinent factors, and giving OPI the benefit of every reasonable inference that could be drawn from the evidence, concludes that no reasonable jury could find for the Plaintiff.  There could be no reasonable finding that OPI has proven legally sufficient market penetration to establish a common law trademark as to the entire United States or any geographical area.

Of course, the jury found that OPI had established legally sufficient market penetration to establish common law trademark rights in geographical areas defined by two of approximately

42,000 zip codes.  The Court finds, however, that this verdict was unreasonable.  Even if this verdict were to stand, the finding is moot because Defendants made no sales of "Optimal Pet" labeled products in either of these zip codes.

   B.   INTENT ISSUES

   Defendants wish the Court to hold that they are entitled to judgment as a matter of law on the bad faith issue and in regard to willfulness.

      1.   Bad Faith

   The Court finds that, in the absence of a finding of infringement the issue of whether Defendants adopted the name "Optimal Pet" in bad faith is moot.

   OPI contends if there were a finding of bad faith it would be entitled to nationwide trademark rights even though it had not established such rights in any geographical area.  Under the Tea Rose-Rectanus[19] doctrine, a user of a mark in a geographical area remote from an area in which an earlier user has established common law trademark rights can itself acquire such

---

[19] The "Tea Rose-Rectanus" or remote, good-faith user doctrine stems from two pre-Lanham cases that evaluated the territorial nature of common law trademarks. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403 (1916)(the "Tea Rose" case); United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 (1918).

rights in the remote area.  The Ninth Circuit Court of Appeals

in the case of Grupo Gigante SA De CV v. Dallo & Co., Inc., 391

F.3d 1088, 1096-97 (9th Cir. 2004) stated:

> [P]riority of use in one geographic area
> within the United States does not
> necessarily suffice to establish priority in
> another area. Thus, the first user of a mark
> will not necessarily be able to stop a
> subsequent user, where the subsequent user
> is in an area of the country "remote" from
> the first user's area. The practical effect
> is that one user may have priority in one
> area, while another user has priority over
> the very same mark in a different area. The
> point of this doctrine is that in the remote
> area, where no one is likely to know of the
> earlier user, it is unlikely that consumers
> would be confused by the second user's use
> of the mark.

There is an exception to the Tea Rose-Rectanus doctrine in

a situation in which "the second adopter has selected the mark

with some design inimical to the interests of the first user,

such as to take the benefit of the reputation of his goods, to

forestall the extension of his trade, or the like." Hanover

Star, 240 U.S. 415.

OPI seeks to transform the exception to the Tea Rose-

Rectanus doctrine into a rule creating a common law trademark

right.  The Court cannot agree.  It may well be that proof of

bad faith would permit the owner of a common law trademark right

in one geographical area to expand that right into another area.

However, there appears no principled basis to hold that one who

first used a name, but has no common law trademark right in any area, has such a right created by virtue of the use in commerce of the name by some other person.

While the Court views the bad faith issue as moot, the Court will discuss the matter for such consideration, if any, as may be viewed as pertinent to an appellate court.

The jury was instructed:

> Plaintiff Optimal Pets, Inc. contends that when the Defendants adopted the name "Optimal Pet" for their products, that is August 1, 2008, they knew that the name "Optimal Pets" was being used to sell competing products by Optimal Pets, Inc. Defendants deny that they knew this.

> If you find, as contended by Plaintiff Optimal Pets, Inc. that when Defendants adopted the name "Optimal Pet" for its products it knew that the name "Optimal Pets" was being used to sell competing products by Optimal Pets, Inc. then you should answer the question "yes" as to the Defendant.  If not, you should answer the question "no" as to that Defendant.

Garmon testified that he never shared the "Optimal Pets" name with Vitamin Shoppe or disclosed the name to any of his fellow board members on the NASC, including Chuck Francis, the President of Nutri-Vet. Trial Tr. 59:23-60:1, July 6, 2011; Trial Tr. 29:15-30:5, 36:10-37:11, July 7, 2011.  Likewise, Bookout testified that he had not disclosed the name to Chuck Francis or anyone else on the NASC board.

28

Employees from both Vitamin Shoppe and Nutri-Vet that were involved in the name selection testified that they had never heard or seen the name "Optimal Pets," although they did preliminary searches on the internet to determine if "Optimal Pet" was an available trademark name and deemed it available. Further, a trademark attorney was hired to clear the name before it was adopted, and Defendants were given clearance. Subsequently, Nutri-Vet filed an application to trademark "Optimal Pet" and the registration was approved for publication.

OPI suggested that Defendants could have learned about its use of "Optimal Pets" as a trademark by doing internet searches that should have revealed the website www.optimalpets.com. There is no evidence that this was actually done.  Moreover, since Vitamin Shoppe intended to use its own internet domain to sell products, and Nutri-Vet intended only to license the brand to Vitamin Shoppe, there was no interest in developing an "Optimal Pet" website.

The Court finds the evidence supporting OPI's bad faith contention to be — at best — at the low end of plausibility. However, if the issue were not moot, the Court would not find that Defendants were entitled to judgment as a matter of law on the issue because, for judgment as a matter of law purposes, the Court may not consider the weight of the evidence.  However, the

Court would have granted a new trial motion[20] because in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.

2. <u>Willfulness</u>

Defendants seek a ruling that, even if they were held liable for trademark infringement, they could not be found to have willfully infringed.  OPI contends that the issue is not properly before the Court.  The Court agrees.

The issue is moot because the Defendants have not been found liable as infringers.  Moreover, the trial did not proceed to the willfulness stage.[21]  Hence, Defendants are now seeking to have the Court effectively grant some sort of "post-trial summary judgment" on willfulness without having been presented with all of the evidence that OPI might wish to present on the issue.

---

[20] A court has more discretion to act in granting a motion for a new trial than in granting a motion for judgment as a matter of law.  <u>Velez v. Roche</u>, 335 F. Supp. 2d 1022, 1034 (N.D. Cal. 2004).  "[T]he district court has the duty . . . to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence."  <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007)(citations omitted).

[21] If the trial had proceeded to the willfulness stage, there was a question whether the issue would be resolved by the jury or the court.

Accordingly, the Court finds, as contended by OPI, that the right of Defendants to judgment as a matter of law or summary judgment on the willfulness contention is not properly presented for decision.


IV.   <u>CONCLUSION</u>

For the foregoing reasons:

    1.    Defendants' Renewed Motion for Judgment as a Matter of Law is GRANTED.

    2.    Judgment shall be entered by separate Order.


SO ORDERED on <u>Friday, June 29, 2012</u>.

_____/s/_____
Marvin J. Garbis
United States District Judge

APPENDIX

The verdict questions were:

I.   TRADE MARK RIGHTS

    1.   In which geographical areas, if any, has Plaintiff Optimal Pets, Inc. proven by a preponderance of the evidence that, by August 2008, it had used in commerce the name "Optimal Pets" as a trademark for the products at issue?

    Your answer can be "the entire United States," a portion of the country, or "None."   If a portion of the country, specify the portion.

        _____
                 Answer Here

    If your answer is "None," do not answer any further questions.

    If your answer is other than "None," answer the remaining questions.

    2.   In which geographical areas, if any, identified in response to Question 1, has Plaintiff Optimal Pets, Inc. proven by a preponderance of the evidence that, by August 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"

    Your answer can be "the entire United States," a portion of the country, or "None."   If a portion of the country, specify the portion.

        _____
                 Answer Here

II.   INTENT IN ADOPTION OF THE NAME

    3.  Has Plaintiff Optimal Pets, Inc. proven
    by a preponderance of the evidence that
    Defendant Nutri-Vet, LLC adopted the name
    "Optimal Pet" for the products at issue in
    bad faith?
    _____
      Yes or No

    4.  Has Plaintiff Optimal Pets, Inc. proven
    by a preponderance of the evidence that
    Defendant Vitamin Shoppe Industries, Inc.
    adopted the name "Optimal Pet" for the
    products at issue in bad faith?
    _____
      Yes or No

After almost two days of deliberations, the jury indicated

they were struggling with question 2, the market penetration

verdict question. With the agreement of the parties, the Court

provided the jury with a revised verdict form with question 2

modified as follows:

    2.   A.   In which geographical area of the
    United States, if any, do you unanimously
    agree that Plaintiff Optimal Pets, Inc. has
    proven by a preponderance of the evidence
    that, by August 1, 2008, it had legally
    sufficient market penetration to establish
    common law ownership rights in "Optimal
    Pets?"

    _____
    Identify the geographical area or say "no
    unanimity"

2

> B.   In which geographical area of the
> United States, if any, do you unanimously
> agree that Plaintiff Optimal Pets, Inc. has
> not proven by a preponderance of the
> evidence that, by August 1, 2008, it had
> legally sufficient market penetration to
> establish common law ownership rights in
> "Optimal Pets?"
>
> _____
> Identify the geographical area or say "no
> unanimity"

The jury then indicated it would like to have the "no

unanimity" option for the jury questions in Part II related to

Defendants' intent in adopting the trademark.  A Second Revised

Verdict Form was provided, and the jury returned a verdict.

Question 1 of the Second Revised Special Verdict asked:

> In which geographical areas, if any,
> has Plaintiff Optimal Pets, Inc. proven by a
> preponderance of the evidence that, by
> August 2008, it had used in commerce the
> name "Optimal Pets" as a trademark for the
> products at issue?
> Your answer can be "the entire United
> States," a portion of the country, or
> "None."  If a portion of the country,
> specify the portion.

The jury's response to the question was "the entire United

States."

Question 2 of the Second Revised Special Verdict asked:

> A.   In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"
>
> _____
> Identify the geographical area or say "no unanimity"

In response, the jury indicated two zip codes: #86305 in Prescott, Arizona and #64113 in Kansas City, Missouri.

> B.   In which geographical area of the United States, if any, do you unanimously agree that Plaintiff Optimal Pets, Inc. has not proven by a preponderance of the evidence that, by August 1, 2008, it had legally sufficient market penetration to establish common law ownership rights in "Optimal Pets?"
>
> _____
> Identify the geographical area or say "no unanimity"

Part B was answered with the following 16 states:

Alabama, Delaware, Hawaii, Iowa, Maine, Mississippi, North Dakota, Nebraska, New Hampshire, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Utah, West Virginia, and Wyoming.

Part II of the verdict asked two questions about the
Defendants' intent adopting the trademark.   Questions 3 and 4 of
the Second Revised Special Verdict asked:

> 3.   Has Plaintiff Optimal Pets, Inc. proven
> by a preponderance of the evidence that
> Defendant Nutri-Vet, LLC adopted the name
> "Optimal Pet" for the products at issue in
> bad faith?
> _____
> Yes or No or "no unanimity"
>
> 4.   Has Plaintiff Optimal Pets, Inc. proven
> by a preponderance of the evidence that
> Defendant Vitamin Shoppe Industries, Inc.
> adopted the name "Optimal Pet" for the
> products at issue in bad faith?
> _____
> Yes or No or "no unanimity"

In response to both questions, the jury answered "no
unanimity."